UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICHARD KELLY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:17-cv-03649-JRS-DML |
| ) | |
| BRUCE IPPEL, ) | |
| LORETTA DAWSON, ) | |
| ) | |
| Defendants. ) | |

**Order Granting Defendants' Motions for Summary Judgment
and Directing Entry of Final Judgment**

Pending before the Court is the motion for summary judgment of defendants Dr. Bruce Ippel and Nurse Practitioner Loretta Dawson. Dkt. 114. During the times relevant to this lawsuit, Dr. Ippel and NP Dawson were medical service providers at the New Castle Correctional Facility (NCCF) in Indiana. The Eighth Amendment deliberate indifference to serious medical needs claims against them by plaintiff Richard Kelly are the only remaining claims in this action. All other claims were dismissed at screening, dkt. 5, by Mr. Kelly upon filing an amended complaint, dkt. 25 & dkt. 26, on summary judgment for failing to exhaust administrative remedies, dkt. 66, and by Mr. Kelly's motion to dismiss, dkt. 75. The claims against Dr. Ippel and NP Dawson are proceeding under Mr. Kelly's Amended Complaint filed January 20, 2018. Dkt. 26.

**I. Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the Court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)).

Instead, the Court accepts as true the evidence presented by the non-moving party, and all reasonable inferences must be drawn in the non-movant's favor. *Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 683 (7th Cir. 2017) ("We accept as true the evidence offered by the non-moving party, and we draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

"As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific,

2

admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotations omitted). "Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Id.* (citing *Packer v. Tr. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015)). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "courts are not required to scour the record looking for factual disputes." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

Finally, a plaintiff opposing summary judgment may not inject "new and drastic factual allegations," but instead must adhere to the complaint's "fundamental factual allegation[s]." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014).

## II. Facts of the Case

The following statements of fact, a chronology of Mr. Kelly's treatments, were evaluated pursuant to the standard set forth above. That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to Mr. Kelly as the non-moving party. *Whitaker*, 849 F.3d at 683. As described below, these facts are supported by the record, which includes affidavits or declarations of the parties, deposition testimony, and medical records. Dkts. 116 & 118 (defendants' evidence) & 130 (plaintiff's evidence). When Mr. Kelly takes issue with a statement of fact set out below, he has not asserted the statement was false *and* offered evidence to demonstrate why. Rather, Mr. Kelly contends the statements are not complete, or he challenges the stated motives of the defendants, or he adds certain consequences to some events.

At all times relevant to the complaint, Mr. Kelly was an inmate at NCCF. Dr. Ippel and NP Dawson, both licensed to practice medicine in Indiana, were employees of the Indiana Department of Correction's (IDOC) contractor and provided medical services at NCCF. Mr. Kelly has been in the custody of the IDOC since 1985, and at NCCF since December 2016. Dkt. 115-3 at pp. 7-8. Both defendants have treated Mr. Kelly. NP Dawson saw him once, and Dr. Ippel saw him numerous times over several years. Dkt. 116-1 at ¶ 3; dkt. 118-1 at ¶ 4.

When he was deposed on February 26, 2019, Mr. Kelly described his medical issues. Mr. Kelly has idiopathic polyneuropathy, meaning nerve damage in his entire body. This causes general and diffused numbness that varies from slight to extreme in intensity. He also has burning, stinging pain that never stops. Mr. Kelly's mouth is numb, and he has stabbing pains in his gums and teeth. Mr. Kelly has cervical stenosis and degenerative bone disease in his cervical spine. There are lesions in Mr. Kelly's ulnar and median nerves that affect his arms and hands. Every night he has elbow and shoulder pain, stabbing pains in his hands and fingers, and burning pains in his legs. Mr. Kelly states that he has lost sixty to eighty percent of the feeling in his feet. He sometimes experiences a "loss of position sense" that has caused him to fall. Dkt. 116-2 at pp. 21-22. Mr. Kelly now frequently uses a wheelchair and is a permanent resident of the NCCF infirmary.

During his time in prison, Mr. Kelly has had eleven surgeries. One of the surgeries, in 2011 on his back, is tangentially relevant to the claims he brings in this lawsuit. *Id.* at p. 22. Mr. Kelly has also had a number of outside consultations. At the time of his deposition, Mr. Kelly's most recent outside consultations were in 2018 when he saw a neurologist and a neurosurgeon. *Id.* at p. 24. He underwent an MRI of his brain and spine, and an EMG of his extremities. *Id.* at p. 25. These examinations confirmed that Mr. Kelly had cervical stenosis, degenerative bone disease,

and "severe nerve damage from head to toe." *Id.* at p. 25. When Mr. Kelly saw the neurosurgeon about these conditions, he asked for specific" narcotic pain medication, but the neurosurgeon said he would leave pain management to Mr. Kelly's IDOC physicians. *Id.* at p. 26. Mr. Kelly then sued him in state court, where an action is still pending. *See Kelly v. Cohen*, No. 48C05-1806-PL-000087 (Madison Cnty, Ark., Cir. Ct. June 13, 2018). *Id.*

When Mr. Kelly arrived at NCCF from the Pendleton prison, his pain medications were Neurontin and Baclofen. Dkt. 116-2 (Dawson affidavit) at p. 27. Not long thereafter Dr. Ippel added tramadol and other medications. *Id.* at pp. 27-28.

On November 17, 2016, Mr. Kelly had his only interaction with NP Dawson, which was for a chronic care assessment. Dkt. 116-1 at ¶ 4. During this visit, her role and obligations were to assess Mr. Kelly's chronic conditions, to document if his condition had changed, and to ensure that his prescriptions were continued. *Id.* at ¶ 5. NP Dawson discussed Mr. Kelly's history of hypertension, gastroesophageal reflux disease, and hyperlipidemia. *Id.* She also spent a significant amount of time discussing Mr. Kelly's back, hip, and nerve discomfort. *Id.* She noted that Mr. Kelly was taking Baclofen (a muscle relaxer), Neurontin (for neuropathic pain), and Tramadol (a synthetic opioid pain medication). *Id.*

NP Dawson reviewed Mr. Kelly's medical records, recent x-rays, outside referral history, and his history of pain medication. *Id.* NP Dawson then expressed concern for how long Mr. Kelly had been taking Tramadol. *Id.* She knew that it is a habit-forming pain medication. *Id.* Tramadol, Baclofen, and Neurontin are all controlled substances that when taken together potentially provide very strong sedative tendencies. *Id.* Specifically, Tramadol can be habit-forming, so NP Dawson's concern was that Mr. Kelly was being provided a medication that may be unnecessary to take for an extended period of time, given the potential for abuse and habit-formation. *Id.*; dkt. 116-1 at

¶ 10. She had also seen in Mr. Kelly's medical records that he may have had a history of substance abuse. Dkt. 116-1 at ¶ 10.

NP Dawson renewed Mr. Kelly's prescriptions for Baclofen and Neurontin, but she informed him that she was going to discontinue Tramadol, given her concerns. *Id.* Mr. Kelly became argumentative and demanded Tramadol in an increased dosage. *Id.*

Mr. Kelly's reaction and demands raised NP Dawson's concern for the potential habit-forming nature of the medication; she informed Mr. Kelly that her decision was based on her medical judgment. *Id.* NP Dawson believed it was in his best interests to attempt to receive pain relief and complete his daily activities without Tramadol, given the risks present with the medication, and given that he was taking two other controlled substances. *Id.*; dkt. 116-3 at 452-55.

Mr. Kelly believes that NP Dawson had no legitimate medical reason to stop the Tramadol prescription, because she knew that Mr. Kelly's conditions were not treatable, were permanent, would not get better, and caused him a great deal of pain. Dkt. 130 at ¶ 4.

Mr. Kelly's Eighth Amendment claim against NP Dawson is for her act in stopping the Tramadol prescription, which he contends caused him to suffer great pain until he was able to get the prescription reinstated by Dr. Ippel on January 11, 2017. *See* dkt. 116-2 at p. 32.

Dr. Ippel knows Mr. Kelly, having studied his medical history and treatments, and has treated him numerous times at NCCF since 2015. Dkt. 118-1 (Ippel affidavit) at ¶ 4. Dr. Ippel knew that Mr. Kelly has significant nerve, back, and hip abnormalities that cause him chronic pain, numbness, and limitation of his daily activities. *Id.* at ¶ 5. Dr. Ippel knows from Mr. Kelly's medical history that he has had prior surgeries, hospitalizations, numerous outside referrals, and a long history of taking prescription pain medication. *Id.* The medications changed many times over

several years in accordance with Mr. Kelly's symptoms and the recommendations of outside specialists. *Id.*

Mr. Kelly was at one time taking methadone, a very strong and habit-forming narcotic. *Id.* Eventually the medication was changed to Tramadol in conjunction with Neurontin and Baclofen. *Id.* As mentioned, Mr. Kelly's dosages have changed over time, with medications either discontinued or altered based upon available medical evidence. *Id.*

Dr. Ippel had numerous visits with Mr. Kelly in 2016. *Id.* at ¶ 6. Mr. Kelly often requested stronger pain medications and asked for methadone. *Id.* On April 13, 2016, Dr. Ippel saw Mr. Kelly about his pain medication. Mr. Kelly complained of discomfort and asked for methadone. *Id.*; dkt. 116-1 at p. 379.

Dr. Ippel understands that recent medical literature and research have suggested the possible detrimental effects of long-term opioid use. *Id.* at ¶ 7. With this awareness, medications such as methadone are no longer indicated to treat chronic pain. *Id.* Instead, the applicable standard of care is to utilize less habit-forming medications to attempt control of chronic discomfort. *Id.* Anti-inflammatories, Tylenol, anti-epileptic, and tricyclic acids are all approved and recommended for use in treatment of chronic pain. *Id.* If these medications are insufficient, there are other pain medications such as Tramadol (Ultram) that can be utilized, but medications like Tramadol still come with certain risks of habit formation. *Id.*

At their April 13, 2016, visit, Dr. Ippel did not agree to restart methadone for Mr. Kelly, instead continuing prescriptions for Baclofen, Neurontin and Tramadol. *Id.*; dkt. 116-3 (medical records) at pp. 379-81. A number of other medications for the treatment of high blood pressure, high cholesterol, and gastroesophageal reflux disease were also renewed, as well as other medications. *Id.*

On June 8, 2016, Dr. Ippel gave Mr. Kelly an injection to his hip to attempt symptomatic pain relief. Dkt. 118-1 at ¶ 8; dkt. 116-3 at pp. 398-400.

Mr. Kelly again saw Dr. Ippel on January 11, 2017, after Mr. Kelly had submitted a grievance concerning his pain management. Dkt. 118-1 at ¶ 9. Mr. Kelly said his symptoms had increased, resulting in a reduction of daily living activities after his Tramadol had been discontinued by NP Dawson. *Id.* While Mr. Kelly had a long medical history, and notations from mental health staff of questionable practices, he had no history of trafficking or abuse of his pain medicine regimen and given his complaint of increase discomfort and limited activities of daily living, Dr. Ippel restarted Tramadol to be taken with the ongoing prescriptions of Baclofen and Neurontin. Dkt. 118-1 at ¶ 9; dkt. 116-3 at pp. 23-25.

On February 24, 2017, Dr. Ippel gave Mr. Kelly another hip injection as well as discussed with him the use of cold compresses for discomfort. Dkt. 118-1 at ¶ 10; dkt. 116-3 at pp. 44-48.

On March 28, 2017, Dr. Ippel saw Mr. Kelly at his chronic clinic visit, in which they primarily focused on Mr. Kelly's back and hip discomfort. Dr. Ippel noted that Mr. Kelly's history of pain medications had been a process of trial and error, but that a mixture of Tramadol, Neurontin, and Baclofen seemed to provide the most relief. Those medications were renewed. Dkt. 118-1 at ¶ 11; dkt. 116-3 at pp. 62-66.

The next chronic care appointment was on June 13, 2017. Mr. Kelly made the same complaints, and Dr. Ippel made the same observations about medications. Dr. Ippel noted that Mr. Kelly was using a cane for stability. Dr. Ippel also observed Mr. Kelly's somewhat slow and broad-based gait, clear speech, and noticeable muscle spasms. Mr. Kelly's treatment plan was to continue his current medications but in increased dosages, and for him to receive these medications

at the medicine lines. Dr. Ippel also told Mr. Kelly that he could get "trigger point" injections as needed. Dkt. 118-1 at ¶ 12; dkt. 116-3 at pp. 111-15.

At their September 1, 2017, chronic clinic appointment, Mr. Kelly's chief concern other than his discomfort were some episodes of falling. Dr. Ippel noted that Mr. Kelly's neuropathy and discomfort appeared to be idiopathic, and that his most recent visit with an outside neurologist did not come with any recommendations or explanations for the neuropathy. Dr. Ippel ordered labs and renewed orders for Mr. Kelly's usual pain medications. He also noted that Mr. Kelly may need to be seen by a neurologist in the future. Dkt. 118-1 at ¶ 13; dkt. 116-3 at pp. 240-43.

In the next several months Mr. Kelly saw a different NCCF physician who renewed the usual pain medications. Mr. Kelly also saw a neurologist, who made no changes to Mr. Kelly's treatment, but recommended that he see a neurosurgeon. Dkt. 118-1 at ¶ 14.

On January 26, 2018, Dr. Ippel submitted a referral for Mr. Kelly to undergo an MRI of his cervical spine, lumbar spine, and brain, following the recommendations from Mr. Kelly's outside treating neurologist. Dr. Ippel noted that Mr. Kelly had a long-standing complaint of neuropathic type symptoms and an EMG consistent with distal polyneuropathy. After Mr. Kelly's recent neurological examination, it was recommended that the MRIs and another EMG/nerve conduction study be done to attempt to determine the etiology of Mr. Kelly's neuropathy. Dkt. 118-1 at ¶ 15; dkt. 116-3 at pp. 951-53.

Just a few days later, on February 6, 2018, Dr. Ippel met with Mr. Kelly about his request for medication for his upcoming MRI. Mr. Kelly had reported some claustrophobia during a prior MRI. Dr. Ippel told Mr. Kelly that it might be possible to have an open MRI, but they would try to find a way to make the presently scheduled MRI successful for him. Dkt. 118-1 at ¶ 16; dkt. 116-3 at pp. 937-40.

On April 17, 2018, Dr. Ippel saw Mr. Kelly for a follow-up following his neurological evaluation, MRI, and EMG studies. The MRI results had not arrived at NCCF, but the nerve conduction studies had arrived and indicated numerous abnormalities with significant neuropathy. Mr. Kelly continued to complain of diffuse pain and was walking with a cane. Dr. Ippel ordered that the MRI results be obtained for their records and review. The prescriptions for Baclofen, Neurontin, and Tramadol were continued. Dkt. 118-1 at ¶ 17; dkt. 116-3 at pp. 866-69.

On May 7, 2018, Dr. Ippel saw Mr. Kelly following an acute episode of back spasms and radiculopathy. Mr. Kelly had been mopping. The diagnosis was a back strain, for which Dr. Ippel recommended that the best treatment would be a few days of rest. Mr. Kelly was told to continue to apply heat and cold as necessary. Dkt. 118-1 at ¶ 18; dkt. 116-3 at pp. 851-54.

Mr. Kelly next saw neurosurgeon Dr. Charles Howe on May 17, 2018, for an evaluation. Dr. Howe's recommendation was epidural steroid injections. He did not recommend any changes to Mr. Kelly's pain medications. Dkt. 118-1 at ¶ 19; dkt. 116-3 at pp. 1-9. On June 1, 2018, Dr. Ippel followed that recommendation and ordered that Mr. Kelly receive steroid epidural injections for pain relief in his back. Dkt. 118-1 at ¶ 20; dkt. 116-3 at pp. 839-41.

On June 11, 2018, Dr. Ippel briefly saw Mr. Kelly after a scheduled off-site epidural injection appointment had to be rescheduled. Dr. Ippel made sure all of the paperwork to continue Mr. Kelly's pain medications was in place. Dkt. 118-1 at ¶ 21; dkt. 116-3 at pp. 818-21.

At some point Mr. Kelly had a sleep study. Dr. Ippel met with Mr. Kelly on June 22, 2018, to discuss the results which had noted some mild disruption but no significant abnormality. Dkt. 118-1 at ¶ 22; dkt. 116-3 at pp. 800-02.

On September 17, 2018, Dr. Ippel and Mr. Kelly discussed concerns about his hearing. Dr. Ippel diagnosed Mr. Kelly with rhinitis. There were not changes made to Mr. Kelly's pain

medications, but Dr. Ippel added prescriptions for an antibiotic, allergy medication, and nasal saline. Dkt. 118-1 at ¶ 23; dkt. 116-3 at pp. 626-29.

About a month later, on October 29, 2018, Dr. Ippel saw Mr. Kelly to discuss an increased use of a wheelchair. Dr. Ippel advised him that the goal was to find a combination of treatments and devices to keep him out of a wheelchair and allow him to move as much as possible. Dkt. 118-1, ¶ 24; dkt. 116-3 at pp. 593-95.

Less than a month later, November 21, 2018, Dr. Ippel again had a long discussion with Mr. Kelly about his renewed request for a wheelchair. Mr. Kelly stated that he would not use it any more than necessary due to the severity of his pain. Dr. Ippel strongly counseled Mr. Kelly against the permanent use of a wheelchair, but agreed to request one for morning usage at least as needed for substantial pain issues. Dr. Ippel also discussed the atrophy, edema, and other side effects that come with chronic use of a wheelchair and Mr. Kelly said he understood. The usual prescriptions for pain medications were renewed, and Dr. Ippel also gave an order for a hand splint to be used at night. Mr. Kelly was instructed to let medical staff know if any of these accommodations ameliorate his discomfort. In addition to the usual pain medications, Mr. Kelly's records also reflect that he was taking Cetirizine, vitamin B12, Dicyclomine, HCTZ, Lipitor, Lisinopril, Lopressor, Montelukast, Nitro tablets, Pepcid, a Xopenex inhaler, and Zantac. Dkt. 118-1 at ¶ 25; dkt. 116-3 at pp. 578-83.

On December 3, 2018, Dr. Ippel saw Mr. Kelly about his request for additional hip injections. Mr. Kelly reported pain while walking but denied any recent injuries or changes to his symptoms. Dr. Ippel and Mr. Kelly discussed the potential benefit of renewed physical therapy. Hip x-rays were ordered, and the array of pain medications was continued. Dkt. 118-1 at ¶ 26; dkt. 116-3 at pp. 564-56).

In the early part of 2019, Dr. Ippel entered an order for Mr. Kelly to be transferred from his primary housing unit to become a permanent resident in the NCCF infirmary so that medications could be administered to him more often – four times daily instead of two times. Dr. Ippel's hope was that by offsetting the timing of Mr. Kelly's Neurontin and Tramadol, they would achieve more consistent pain relief. Dkt. 118-1 at ¶ 27.

As of the time the defendants' motion for summary judgment was filed, Mr. Kelly was still a resident of the NCCF infirmary. Dkt. 118-1 at ¶ 28.

On December 26, 2018, Mr. Kelly's blood tests revealed an alarmingly low level of Neurontin, a significant drop in his historical record levels, especially considering he was taking an extremely high dose of the medication. In Dr. Ippel's opinion, the only reasonable explanation for a drop of this magnitude would be a patient's non-compliance with medication instructions. The medical records indicated that Mr. Kelly was being given the medication by the nursing staff as ordered. Dkt. 118-1 at ¶ 29.

After consultation with the Regional Medical Director Michael Mitcheff, it was determined that Mr. Kelly would begin to receive a tapered dose of Neurotin, with an eventual discontinuation, given the evidence that the medication was not taken as prescribed and dispensed. Dkt. 118-1 at ¶ 30.

### III. Discussion

Mr. Kelly's claims against the defendants for deliberate indifference to his serious medical needs arise, because he is a convicted offender, under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a deliberate indifference to serious medical needs claim, Mr. Kelly must show that (1) he suffered from an objectively serious medical condition, and (2) the defendants knew about the condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."). To elaborate further:

> To prove deliberate indifference, mere negligence is not enough. A plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (internal citations and quotations omitted). To elaborate even more, deliberate indifference means a culpable state of mind equivalent to criminal recklessness. *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016).

The parties do not dispute that Mr. Kelly had objectively serious medical needs. Rather, Mr. Kelly's focus is on NP Dawson's single act of terminating his Tramadol medication, and on Dr. Ippel's deliberate indifference to his numerous pain conditions over the course of time since he arrived at NCCF. He alleges that Dr. Ippel "has continued to provide a level of healthcare known to be of no value" in his treatment. *See* dkt. 130 (Mr. Kelly's response).

### A. NP Dawson

Mr. Kelly contends that NP Dawson's act of terminating the Tramadol prescription was made with no legitimate medical reason, went against outside physicians' recommendations, and returned him to a level of care known to be ineffective. *Id.* at ¶¶ 4-8.

Without deciding the question, Mr. Kelly has at best stated a claim for negligence against NP Dawson. But given the rigorous standard that NP Dawson's actions must equate to criminal recklessness to show deliberate indifference, Mr. Kelly has not shown that level of culpability.

NP Dawson's meeting with Mr. Kelly was her first and only contact with him. Mr. Kelly was somewhat new to NCCF, and NP Dawson reviewed Mr. Kelly's medical records, saw the conditions he complained of, saw his history of surgeries and outside consultations, and saw his history of medications which included narcotics. NP Dawson testified that she was concerned about the combination effect three strong pain medications would have, was worried about the possibility of addiction or abuse, and made a professional judgment decision to terminate one of Mr. Dawson's medications – the Tramadol – to see how he would fare. Such decisions are the kind made by medical professionals every day as they attempt to tweak a patient's medications to provide the most relief with the least amount of intervention. Mr. Kelly's immediate hostile reaction and demand for an even stronger dose of Tramadol only reinforced NP Dawson's opinion that a danger of addiction or abuse was present.

Pain control is a matter that requires the application of "medical expertise and judgment" and a decision to try one combination of drugs over another, even with a recommendation from a different health care provider for a different course of action, simply does not rise to the level of criminal recklessness and deliberate indifference to the serious medical need. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Mr. Kelly refers to this type of medical practice as using him for

a "guinea pig." However, sometimes when medical professionals are searching for the optimal combination of treatments, that makes, in effect, the patient a guinea pig. Under the circumstances of this case, the attempt to find a better combination of pain medications might have been a very slight case of guinea pig testing, but it was not deliberate indifference.

NP Dawson's motion for summary judgment is **granted**.

### B. Dr. Ippel

Mr. Kelly's Eighth Amendment claim against Dr. Ippel comes down to the actionable conduct of continuing a course of treatment known to be of no value to the patient. This is a subset of deliberate indifference claims, such as pain management, that the Seventh Circuit describes as "a deliberate decision by a doctor to treat a medical need in a particular manner." *Snipes*, 95 F.3d at 591. Dr. Ippel, according to Mr. Kelly, should have provided different, and stronger, pain medications to alleviate his pain, including stronger narcotics such as methadone. To continue to give him the same generally ineffective pain medication over the years was deliberate indifference, Mr. Kelly argues.

The record does not support Mr. Kelly's claim. It demonstrates that Dr. Ippel did not ignore a serious medical condition. To the contrary, Dr. Ippel frequently met with Mr. Kelly after his arrival at NCCF, and continued meetings with him after this action was filed, all in an apparent effort to find Mr. Kelly some relief. Dr. Ippel at one point doubled Mr. Kelly's pain medication dosage. He recommended and referred Mr. Kelly to outside neurologists for an MRI and EMG studies. Dr. Ippel provided Mr. Kelly with injections into his hip to alleviate pain. He ordered a hand splint for use at night, authorized the use of a wheelchair, and took x-rays. To try to provide better pain relief, Dr. Ippel moved Mr. Kelly into the infirmary as a permanent resident so that he could receive more doses of his pain medications. Dr. Ippel's recommendation to taper Mr. Kelly

from the Neurontin to a different medication, made in consultation with the IDOC Regional Medical Director, was done only after laboratory tests indicated a misuse of the medication. On this record, no rational trier of fact could conclude that Dr. Ippel's actions were deliberately indifferent to Mr. Kelly's serious medical needs.

Mr. Kelly gave heavy emphasis to the opinions and recommendations of outside specialists concerning pain medication. When outside doctors recommended stronger drugs, but IDOC medical providers declined the recommendation, Mr. Kelly accused the IDOC medical providers of deliberate indifference to his pain. And when an outside specialist deferred to IDOC medical providers for pain management, Mr. Kelly brought suit against that doctor accusing him of medical malpractice. A disagreement between a patient and his doctor, or between two doctors, about the particular course of treatment is generally insufficient to establish an Eighth Amendment violation. *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

Finally, Mr. Kelly has no evidence that anything Dr. Ippel did, or failed to do, was a substantial departure from acceptable professional judgment. *See Burton v. Downey*, 805 F.3d 776, 785-86 (7th Cir. 2015). Mr. Kelly's contention that Dr. Ippel, or NP Dawson, should not have considered the possibility of addiction to pain medication as a factor in their decisions, because addiction cannot be predicted, is without merit. Taking into consideration the risk of addiction was just one factor, of many, that NP Dawson considered, and that Dr. Ippel was cognizant of. Taking as true, for purposes of Mr. Kelly's motion, that addiction cannot be predicted, it does not mean that health care professionals should disregard the risk of addiction when making medication decisions.

Mr. Kelly's assertion that chronic pain should be managed with narcotics is contrary to emerging professional views. Dr. Ippel is aware of the current recommendations to avoid treating

chronic pain with narcotics and to instead find non-opiate means to alleviate pain. *See* dkt. 118-1 at ¶ 38. He testifies that long-term narcotic use, even for chronic pain, can create more concerns and side effects than the benefit they provide. *Id.*

The record shows conclusively that Dr. Ippel was not deliberately indifferent to Mr. Kelly's serious medical needs. No rational trier of fact could find otherwise. Dr. Ipple's motion for summary judgment is **granted**.

### IV. Conclusion

For the reasons explained above, Dr. Bruce Ippel's and Nurse Practitioner Loretta Dawson's motion for summary judgment, dkt. [114], is **granted**. This case is **dismissed** with prejudice. Final judgment consistent with (1) this Order, (2) the screening Order of October 17, 2017, (3) the amended complaint of January 30, 2018, dismissing defendants, and (4) the Order of September 17, 2018, dismissing defendants, shall now enter.

**IT IS SO ORDERED**.

Date: 3/13/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Richard Kelly
860033
New Castle Correctional Facility - Inmate Mail/Parcels
1000 Van Nuys Road
New Castle, IN 47362

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com